# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2021-3319
_____

JARED CORDEL CLAKLEY,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Coleman Lee Robinson, Judge.


July 30, 2025

RAY, J.

Jared Clakley entered an open plea to second-degree murder and possession of a firearm by a convicted felon. The trial court adjudicated him guilty and sentenced him on both counts. He now appeals the sentencing order, alleging two errors in the process that led to his sentence and one error in the sentence itself.

Because Clakley failed to preserve his challenges to the sentencing process, we are precluded from considering those claims, including under a fundamental error analysis. Even if we could reach those issues, we would find that there was no fundamental error.

The alleged error in the sentencing order was preserved and is properly before us. But this claim also lacks merit. We therefore affirm.

## I. Sentencing Process Claims

In *Emerson v. State*, this court held that a defendant who pleads guilty or no contest may not appeal an unpreserved error in the sentencing process, even if that error is fundamental. 50 Fla. L. Weekly D1227, 2025 WL 1573698, at *2 (Fla. 1st DCA June 4, 2025). The court reached this conclusion through a close reading of Florida Rule of Appellate Procedure 9.140(b)(2)(A), supported by a studied examination of the rule's origin, the Florida Supreme Court's decisions in *State v. Dortch*, 317 So. 3d 1074 (Fla. 2021) and *Jackson v. State*, 983 So. 2d 562 (Fla. 2008), and the limited scope of appellate review following a plea. *Id.* at *2–6.

In its analysis, the majority recognized a "gap" in rule 9.140(b)(2)(A)(ii) concerning the appealability of sentencing issues following a plea. While the rule permits appeals of preserved sentencing errors, it contains no provision expressly authorizing appeals based on errors in the sentencing process, whether preserved or not. In the majority's view, this omission makes it "unclear whether appeal of sentencing process errors is even authorized." *Id.* at *5. The court further explained that *Dortch* suggests a defendant who pleads guilty may not appeal unless the preservation requirements of rule 9.140(b)(2)(A)(ii) are met. *Id.* And if the rule contains no exception for fundamental error, then recognizing one for unpreserved sentencing process errors would appear "inconsistent with *Dortch*." *Id.* Against that backdrop, the court certified the following question to the Florida Supreme Court as one of great public importance:

> UNDER RULE 9.140(b)(2)(A)(ii), CAN A DEFENDANT WHO ENTERED A PLEA OF GUILTY OR NOLO CONTENDERE RAISE ON APPEAL A CLAIM OF UNPRESERVED FUNDAMENTAL ERROR IN THE SENTENCING PROCESS?

*Id.* at *2.

We certify this question as well. In so doing, we take no position on whether the rule's failure to account expressly for

2

sentencing process errors forecloses appellate review of those claims entirely. It may be that these errors fall within the catch-all in subdivision (b)(2)(A)(ii)e., which allows for an appeal "as otherwise provided by law." *Id*. at *11 (Tanenbaum, J., concurring in part and in result but dissenting as to certification). But even under that reading of the rule, the error must still be preserved. *Id*.

At bottom, we find no provision in the procedural rules–or in substantive law, for that matter–authorizing an appeal by a pleading defendant of an *unpreserved* sentencing process error. We should therefore summarily affirm on these issues.

A.

Assuming we could consider Clakley's challenges to the sentencing process, we would still affirm because no error occurred, let alone fundamental error. Clakley first argues that the trial court fundamentally erred by considering a crime for which he was not charged. He next argues that the trial court committed fundamental error by accepting unsworn victim impact statements. We address each issue in turn, after first providing the relevant background.

At the sentencing hearing, the State presented evidence that Clakley threatened to shoot the victim, G.D., and then carried out that threat. The State entered into evidence and played for the trial court two recordings: a phone call made shortly before the shooting and a video capturing the incident in which Clakley killed G.D. The evidence showed that, on the night of the incident, Clakley called K.D., the mother of his children. During the call, they argued, and Clakley threatened to come to the home of K.D.'s father, G.D., and shoot both K.D. and G.D.

About fifteen to twenty minutes later, Clakley arrived at the home of K.D.'s parents, G.D. and C.D. He remained in his car with the window down. An argument followed. Clakley was repeatedly told to leave but refused. When G.D. approached the vehicle, a struggle broke out through the car window. Clakley put the car in reverse, dragging G.D. and striking C.D. in the process. He then shot G.D. multiple times at close range.

3

Clakley testified that he was under the influence of alcohol and drugs at the time of the incident. He said he was trying to leave when G.D. approached his vehicle and claimed he fired the first shot only to scare G.D. so he could get away. Clakley stated that he didn't remember anything after that first shot. He expressed remorse, saying "[i]f I could go back and change that day, I would. I had no intentions of killing him that day. It was something—a tragic accident and I wish I could change it." When asked why he had a gun despite being a convicted felon, Clakley replied, "I was just trying to leave. I don't know why. I don't know why."

The State sought the maximum sentence—life imprisonment—and argued that the recorded phone call rebutted Clakley's contention that he had not targeted G.D. In the call, Clakley could be heard threatening to shoot G.D., and the video showed that Clakley was repeatedly told to leave but refused. Instead, Clakley shot G.D. five times—in the neck, chest, arm, abdomen, and thigh. For his part, the defense argued that Clakley was trying to leave when G.D. attacked him through the car window, and that the shooting would not have occurred if G.D. had not initiated the fight. Defense counsel sought leniency and asked for the minimum sentence.

After stating all the material it reviewed, the trial court began its pronouncement of the sentence as follows:

> There's no little irony to the fact that if I gave you the minimum, that you would be the age of the man that you murdered when you got out of prison. And you want me to put you in a position where your life gets to begin where his life ended.
>
> . . . .
>
> What your testimony to me today is that you have some—all these clear recollections and you were level-headed and yet of the same time, it's of excuse that you had been drinking, taking Xanax, Lortab, and cocaine that night. Let's just back up and look at the picture. I heard those calls that you made. You told them you were

4

going to come over there and shoot them. You said it repeatedly.

The State chose not to charge first-degree murder. And I don't know clearly all the evidence, but what I heard—and I'm sure there was a discussion about whether they should do that. Then after that, after the language you used and the threats you made, you followed up on them. And then you presented to me as if it's a surprise that you were not welcomed.

. . . .

You [testified that you] had no choice but to not leave after they told you repeatedly to leave. You had no choice but to floor it and put it in reverse. I don't think that was an accident. There's no way that you took off at that speed dragging [G.D.], as it looked like he was hanging onto the door, as you initially backed up. And then, you act surprised that he would defend his wife that you knocked down with the car.

Everything you did was a choice leading to only one outcome. There was only one logical way this was going to end, and that was with extreme violence. And you knew the whole time it was going to be you because you told them it was going to be you. You took a weapon—and you've been convicted before for displaying a firearm. You knew that you weren't supposed to have any gun. But you didn't care. You had a point to make. And you made sure everybody—up to the point you pulled the trigger, you made sure everybody knew.

And then, you pulled the gun out and you testified to the Court that you reached for the gun to scare him. And yet, you shot him all the way down his body. Five times. Not once. You didn't miss once. You didn't shoot by him. There was no hold the gun to threaten him. From what I saw in that video, the moment you picked up the gun, you were squeezing the trigger at his body and you hit him all five times.

5

. . . You weren't trying to scare him. You were trying to kill him and you succeeded. And there's no justification, there's no excuse.

. . . You're still blaming him. All he had the nerve to do was show up and protect his family on his own property, and you wouldn't leave. And that's inexcusable. . . . But there is no justification for what you did. You created it, you said it was going to happen, and then you followed through. . . .

. . . .

. . . [T]o give you the minimum penalty required by law, I think, does not do justice to that act that you did, particularly when you made every decision to continue.

You had, by your own testimony, 15 to 20 minutes to calm down and not go over there. But you did. You knew what would happen because you said it was going to happen. When they told you to leave, you ignored them. You didn't ignore them. I take that back. You dog-cussed them even more, until it reached the point where you pulled a gun, and you shot a man five times, and murdered him in cold blood.

The court then imposed a life sentence for the murder count, as recommended by the State. After the court announced the sentence, Clakley interjected, "I'm glad that p[*]ssy motherf[*]cker dead" and "I'm glad that b[*]tch dead." The court replied, "All this has done is confirm that this is the right sentence."

B.

Clakley first contends that he is entitled to a new sentencing hearing before a different judge because the trial court improperly based its sentence on the uncharged offense of first-degree

6

murder.[1] For support, he cites *Berben v. State*, 268 So. 3d 235 (Fla. 5th DCA 2019), where the Fifth District held that a trial court's reliance on unsubstantiated assumptions about uncharged conduct constituted fundamental error.

In *Berben*, the defendant was convicted of several counts of possessing child pornography. 268 So. 3d at 236. He was not charged with distributing the material, and there was no evidence that he had done so. Despite this, the trial court made "specific and unsubstantiated comments" at sentencing implying that the defendant had engaged in distribution and equating that conduct with the physical or sexual abuse of a child. *Id.* Based on those comments, the appellate court found that the trial court had relied on an uncharged offense in imposing sentence and concluded that this violated due process and constituted fundamental error.[2] *Id.* at 238.

Clakley maintains that the same error occurred here. He points to the trial court's reference to the State's decision not to charge first-degree murder and to remarks that, in his view,

---

[1] "Premeditation is the essential element which distinguishes first-degree murder from second-degree murder." *Coolen v. State*, 696 So. 2d 738, 741 (Fla. 1997).

[2] Judge Grosshans dissented. 268 So. 3d at 239–40. Among other reasons, she "disagree[d] with the majority's conclusion that it is apparent from the face of the record that the trial court impermissibly considered uncharged, unsubstantiated crimes, resulting in a denial of the defendant's due process rights." *Id.* at 240. Recognizing that a sentencing court can rely on trial testimony and evidence as appropriate sentencing considerations, in her view, the trial judge's remarks were based on "facts in evidence, not unsubstantiated claims or speculation." *Id.* Regardless of which view of the trial court's remarks is correct, the Fifth District later "caution[ed] that [its] decision in *Berben* should be read narrowly," explaining that "*Berben* does not obviate the duty to make a timely objection nor does it stand for the proposition that the facts of the underlying case are not properly considered when imposing sentence." *Broy v. State*, 314 So. 3d 739, 741 (Fla. 5th DCA 2021).

suggest the court believed he was nevertheless guilty of that offense. For instance, the court emphasized the number and accuracy of the shots, concluded that Clakley intended not to intimidate but to kill, characterized the act as a cold-blooded murder, and stated that the minimum lawful sentence would fail to account for the gravity of the offense.

When viewed in context, however, the trial court's comments were an invited response to Clakley's version of events and reflected its broader assessment of the evidence. In seeking leniency, Clakley placed intent squarely at issue and did so repeatedly: first, by denying that he had targeted the victim; next, by claiming he went to the residence merely to talk and did not expect events to escalate; and finally, by asserting that he drew his firearm only to scare the victim and "had no intentions of killing [the victim] that day." Having raised the issue, Clakley acknowledges that the court could consider and respond to this testimony. The court did precisely that.

Assuming for the sake of argument that the trial considered uncharged conduct, there is no indication that it relied on unsubstantiated allegations, which is the controlling standard. *See Paul v. State*, 277 So. 3d 232, 239–40 (Fla. 1st DCA 2019); (recognizing that the sentencing court may consider alleged misconduct when supported by evidence); *Barlow v. State*, 238 So. 3d 416, 417 (Fla. 1st DCA 2018) (acknowledging that consideration of uncharged conduct at sentencing is not erroneous where, among other reasons, the conduct is supported by record evidence); *accord Constantin v. State*, 301 So. 3d 449 (Fla. 5th DCA 2020) (Mem.); *Imbert v. State*, 154 So. 3d 1174, 1176–77 (Fla. 4th DCA 2015).

In *Barlow*, for example, the defendant argued that the trial court improperly considered unrelated, uncharged, and unsubstantiated claims when imposing his sentence for multiple counts of possessing child pornography. 238 So. 3d at 417. He pointed to testimony presented at sentencing by a law enforcement officer who stated that the defendant had indicated in an online chat that he wanted to have sex with a fourteen-year-old boy—a crime for which he was not charged. *Id*. This court rejected the defendant's claim of fundamental error for three independent reasons. First, there was no indication that the trial court relied

on the uncharged conduct in determining the sentence. *Id*. Second, even if the court had considered the officer's testimony, the allegation was not unsubstantiated. *Id*. Third, the conduct was directly relevant to the defendant's request for a downward departure, which relied in part on a report finding that he posed a low risk of reoffending. *Id*.

This case, unlike *Berben* and more closely resembling *Barlow*, does not involve a sentencing decision based on unsupported allegations. Evidence presented at the hearing, including a recorded phone call made before the shooting and video footage of the incident, showed that Clakley threatened to kill the victim during a phone call and then drove to the victim's home and ultimately shot him five times. Sentencing judges have wide discretion to consider a defendant's conduct and the surrounding conditions of the offense when imposing an in-range sentence. *See* § 921.002(1)(c), Fla. Stat; *Garcia v. State*, 346 So. 3d 586–87 (Fla. 2022). In view of all the circumstances—including Clakley putting intent at issue—we cannot conclude that the trial court committed fundamental error rising to the level of an illegal sentence. *See Garcia*, 346 So. 3d at 586 (noting that fundamental error in the sentencing context has been recognized only in rare circumstances).

C.

Next, Clakley contends that the trial court committed fundamental error by accepting unsworn victim impact statements during the sentencing hearing. In his view, unsworn victim impact statements are inadmissible under section 921.143, Florida Statutes, and this court's precedent in *Patterson v. State*, 994 So. 2d 428 (Fla. 1st DCA 2008). The State counters that a subsequent amendment to the Florida constitution provides crime victims with an affirmative right to give an impact statement and to have it considered by the sentencing court. *See* art. I. § 16(b), Fla. Const. And even if the trial court erred by admitting the unsworn statements, the State submits there was no fundamental error because it is not clear from the record that the trial court relied on them when sentencing Clakley. Because we agree with the State on its latter point, we need not reach the other arguments presented.

9

At the sentencing hearing, the prosecutor informed the trial court that she had filed multiple victim impact statements in the form of letters, and the trial court confirmed receiving them. After the State and defense presented evidence and argument, the trial court sentenced Clakley. The victim impact statements were referenced only once by the trial court, at the outset of its oral pronouncement:

> I have reviewed the arrest report that was, I believe, pending. It was occluded [sic] and then stipulated to within the factual basis before the plea agreement, as well as the plea agreement itself. And I've heard the testimony presented today, watched the exhibits, read the letters that were submitted by other people who didn't speak today.

As addressed in the first issue above, the trial court went on to articulate its sentencing rationale in detail, drawing from evidence presented at the hearing. Its brief acknowledgment that it had reviewed the victim impact statements does not, on its own, establish fundamental error—or any prejudicial error for that matter. *See Baugh v. State,* 253 So. 3d 761, 765 (Fla. 1st DCA 2018) (holding that a trial court's error in admitting unsworn victim impact statements was not fundamental because "it [was] not apparent from the record that the court relied on the victim's unsworn statement in sentencing [the defendant]").

## II. Sentencing Error Claim

In his final issue, Clakley contends that the trial court erred in imposing a $2 cost pursuant to section 938.15, Florida Statutes, without identifying the municipal or county ordinance that authorized the cost. Clakley preserved this claim by filing a motion to correct sentencing error pursuant to Florida Rule of Criminal Procedure 3.800(b).

Clakley concedes that after he filed his initial brief, this court denied the same claim he raises here. *See Malden v. State*, 359 So. 3d 442, 443 n.1 (Fla. 1st DCA 2023) (holding that "there can be no prejudice where the ordinance exists, applies to the defendant, and lawfully imposes the fine"). Just as in *Malden*, Clakley does not

10

dispute the existence of the authorizing ordinance, that it applies to him, and that it lawfully imposes the fine.

AFFIRMED.

LEWIS and NORDBY, JJ., concur.

—————————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

—————————————————

Michael Ufferman of the Michael Ufferman Law Firm, P.A., Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Benjamin L. Hoffman, Assistant Attorney General, Tallahassee, for Appellee.

11